Madden, Judge,
delivered the opinion of the court:
The plaintiff on June 27, 1938, made a contract with the Government to build some 15 miles of levee along the Illinois Biver and one of its tributaries. The price was 8y2 cents per cubic yard for the quantity of levee embankment satisfactorily placed. The work was completed on September 6, 1940, final payment was made by the Government, which the plaintiff accepted without any protest or the reservation of any claim. In this suit the plaintiff claims damages because of (1) the Government’s alleged failure to furnish skilled and semiskilled labor from relief rolls, (2) the Government’s alleged misrepresentation of the condition of certain borrow pits, as to the height to which they were filled and the nature of the materials in them, and (3) the Government’s assessment of liquidated damages for late completion of the work, which late completion the plaintiff says should have been excused under the terms of the contract.
We discuss first the question of relief labor. The invitation for bids and the contract gave the plaintiff notice that a part of the money for the project was to come from emergency relief funds and the balance from a regular appropriation for river improvements; that in order to use üp the amount allotted from emergency relief funds, the contractor would be obliged to use enough man-months of relief labor to account for the allotment on the basis of a specified number of dollars for each such man-month. Before making the plaintiff’s bid, the plaintiff’s president had, upon inquiry, been told by the Works Progress Administration that there was plenty of common labor on the relief rolls, but no skilled or semiskilled labor. After the contract was signed, the plaintiff submitted a proposed schedule for the use of labor which did not call for enough common labor to use up the *385 emergency relief allotment, and the Government disapproved the schedule. The plaintiff claims that the effect of the Government’s insistence was that it had to do many things with hand labor that it could have done more economically with machines operated by shilled labor, and was thereby damaged. We have, however, found that the plaintiff at the beginning of the work greatly underestimated all its labor costs, that, in fact, in performing the job it spent $76,202.60 for labor though it had originally estimated only $32,567, and that it spent some two-thirds of its labor costs for skilled labor, though it had estimated that skilled labor would account for only one-half of its labor costs. It is obvious, then, that the requirement of the contract that a certain amount of the labor be secured from the relief rolls which meant, as the plaintiff knew, that that amount would have to be unskilled labor, did not cause the plaintiff to use unskilled labor nn-economically in order to comply with the contract. The plaintiff obtained from sources other than the relief rolls, more than three times as much skilled and semiskilled labor as it had intended to use, and still used the amount of common labor necessary to absorb the relief portion of the appropriation. With regard to the plaintiff’s contention that it used an excessive amount of common labor in clearing the site, early in the work, when perhaps it did not know that its total labor costs would be so large, we think that the plaintiff’s claim that it would have used machines to clear the site is an afterthought. It did not have the machines, they may not have been available for purchase or rent, at that time it had never used them, and their use was not customary in the industry.
We pass to the plaintiff’s claim of misrepresentation of the contents of the borrow pits. In the construction of levees in the same area in former years, depressions had been left in the land between the levee and the river by the removal of soil to build the levees. When the contract here in question was made, another contractor under a wholly separate contract was engaged in dredging the river bottom and was placing the dredged spoil in these depressions, as a convenient place to get rid of it. When the plaintiff’s agent *386 inspected the site with a view to bidding, some of the depressions were full, some partly full, and some still empty. The plaintiff claims that it supposed that the dredging was a part of the same project as the building of the levees, that all the depressions would be filled with dredged spoil, and that the substance of the spoil would be clean sand so that, when removed from the depression and placed in the levee, it would drain out readily and make a firm levee. These assumptions seem to us unwarranted. We would suppose that an experienced contractor would know that the amount of material dredged from the bottom of a river would be the amount, and only the amount, necessary to produce the specified depth of channel, and that whether that amount would fill or overfill or not fill a depression on the bank, would be quite accidental. As to what kind of material the-dredge would in the future bring up from the bottom of the river, there was no representation. The Government furnished to bidders certain drawings showing cross sections of the proposed new levee at various stations. At stations, where dredging had not yet been done but was to be done, there was a line indicating the probable top of the spoil in the old borrow pits after the dredging would have been done. None of these drawings represents a location within the area now involved in this litigation, or within some 800 feet of the end of such an area. We think, therefore, that there was no misrepresentation of .the level t'o which the old borrow pits would be filled. As to misrepresentation as to the nature-of the substance in the old borrow pits, seven test pits had’ been dug by the Government and the material dug up had' been truthfully recorded. It showed that the spoil consisted mostly of sand, but in two of the pits there were strata of' mixed silt, clay, sand, and shell. If what came from the dredge into the old borrow pits after the contract was made-did not correspond with what was in some of the test pits,, that is no evidence of misrepresentation by the Government..
It should be observed that, upon the plaintiff’s complaint, that it was put to extra expense because some of the old borrow pits had water and silt in them which made the terraim difficult to work over and the material difficult to place in the> new levee, the Government treated the situation as one in *387 volving changed or unforeseen conditions entitling the plaintiff to an equitable adjustment under Article 4 of the contract. Two change orders were issued and the plaintiff was given additional compensation. In the correspondence preceding these change orders the contracting officer had in his letter of August 11, 1939, referred to in finding 19, requested the plaintiff to advise him in writing whenever work was commenced on any location where it was claimed that “changed conditions” existed. The plaintiff did so notify the contracting officer with regard to several specified sections, that officer investigated the claims, and the change orders mentioned above were made. The contract work was completed on September 6, 1940, and was accepted by the Government. On September 19, 1940, the plaintiff wrote the contracting officer accepting Change Order No. 2 but requesting that further change orders be issued giving additional compensation for expense incurred at a number of other named stations. The plaintiff’s letter conceded that it had not notified the contracting officer in writing before it did the work at these stations, but said it had notified the Government’s engineer on the job, on each occasion, that it considered that conditions were “other than specified. On October 15, the contracting officer replied saying that he could not now consider these new claims because he had not been notified of them and hence had had no opportunity to investigate them, as Article 4 of the contract required, before conditions were disturbed. On October 21 the plaintiff responded that the Government’s engineer on the job had told the plaintiff’s superintendent that a letter to the contracting officer’s office was not necessary, since that office had been advised of the changed conditions. This last statement apparently had reference to the plaintiff’s letter of Jome 16, finding 18, in which the plaintiff made its general statement as to the conditions it had encountered. We have found in finding 28 that the Government’s engineer on the job had told the plaintiff what the plaintiff said he had, and had made notes of the amount and the cost of the work in the locations in question.
On December 2, the contracting officer replied to the plaintiff calling attention to the lack of authority of an in *388 spector to waive or alter any term of the contract. But he also said that he had investigated the facts as best he could after the work was done, from surveys made just previous to the work and records made during the performance of the work, and had concluded that his decision would have been the same if he had been notified in time. He advised the plaintiff of his right to appeal to the Chief of Engineers, and said that if an appeal was promptly submitted to him, he would forward it with a recommendation that the 30-day appeal period specified in the contract be waived. On January 13, 1941, which was 90 days after the contracting officer’s decision of October 15, 1940, and 42 days after his letter of December 2, 1940, the plaintiff appealed in writing to the Chief of Engineers. That officer, on December 23, 1941, refused to pass on the merits of the plaintiff’s claim because the appeal had not been filed within 30 days as required by Article 15 of the contract.
Upon these facts the plaintiff is not entitled to recover. ■ If did not take its appeal within the time specified in the contract. It did not notify the contracting officer of its claim in time for him to investigate conditions before they were disturbed, as the contract required. This last neglect was in the face of a recent and considerate request from that officer, which request again showed, as the contract itself did, why the procedure was reasonable. In spite of this negligence of the plaintiff, the contracting officer did investigate and decide, as best he could after the work was done, and he decided against the plaintiff on the merits of the claim. We cannot say that his decision was wrong, even if we should disregard the plaintiff’s failures to take the steps required by the contract.
The plaintiff’s third ground of claim is for liquidated damages withheld from its compensation. The contract provided for such damages at the rate of $20 per day for late completion. The work was completed 151 days after the completion date as postponed by suspensions of the work and extensions granted, and $3,020 was, accordingly, withheld on that account. The plaintiff says that one of the causes of its delay was that its subcontractor abandoned the work shortly after its commencement, and that it required some *389 months for the plaintiff to secure the necessary machinery to resume the work. The plaintiff says that the subcontractor abandoned the work because of difficulties in obtaining relief labor, and that these difficulties were the result of acts of the Government. We have discussed the relief labor question above and have concluded that the plaintiff was aware of the relevant facts before it made its contract. We further think that the question of relief labor was not the principal reason for the subcontractor’s abandonment of its contract. That was caused rather by the exorbitant charges which one of the subcontractor’s officers made to it for the rental of machines, which made it impossible for the subcontractor to do the work at a profit.
The plaintiff says that lack of skilled labor from the relief rolls caused it to be delayed by having to do work by hand that could have been done more quickly by machines. We have considered this same problem above in connection with the plaintiff’s claim for increased costs, and have concluded that the plaintiff was able to get skilled labor from other than relief sources in an amount more than three times as large as it had planned to use. We, therefore, find no delay in that regard which the Government was obliged to excuse. The plaintiff’s third contention with regard to late completion is that the fact that the borrow pits were not completely filled with dredging spoil resulted.in mud holes and sloppy material which, when placed in the levee, spread out and had to be dried out and rehandled, requiring much time. We have discussed this problem above. As we have seen, the plaintiff made several requests for additional compensation because of “changed” or unforeseen conditions. In none of these did it request an extension of the contract time, but in the two change orders which resulted from these requests, additional time was’given. In our finding 34 we show that on November 1, 1939, the plaintiff asked the contracting officer for an extension of time of “about 60 days” because of several things, the first mentioned of which was the muddy condition of the borrow pits. As to none of the items mentioned in this letter was the request timely, within the requirements of Article 9 of the contract. The evidence does not show that the contracting officer considered or decided *390 the question raised by this request. In any event he did not grant it, and the plaintiff did not revive it, even at the time of the final settlement of the contract. In our finding 38 we set out correspondence relating to a request that liquidated damages be not assessed for the time that would be required to dress the levee. The contracting officer denied this request and the plaintiff took no appeal to the Chief of Engineers pursuant to Article 9 of the contract. As we have seen, when settlement was made after the completion of the contract, and $3,020 was assessed as liquidated damages and deducted from the plaintiff’s compensation, the plaintiff accepted the payment without any protest, or the reservation of any claim. The plaintiff having thus failed to pursue its remedy under the contract, is not, in the circumstances here present, entitled to recover.
The plaintiff’s petition will be dismissed. It is so ordered.
Whitakbe, Judge; LittletoN, Judge; and Jomas, Chief Justice, concur.